## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

Terry Wagner (R07282),　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)　　　Case No. 21 C 50150
　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　Hon. Iain D. Johnston
C/O Lowe, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　)

## MEMORANDUM OPINION AND ORDER

Defendants' motion for summary judgment [204] is granted, in part, and denied, in part. The summary judgment motion is granted in favor of Defendant Rodriguez and Defendant Varga, but denied as to Defendant Lowe.

## BACKGROUND

Plaintiff Terry Wagner, an Illinois state prisoner, filed this *pro se*[1] civil rights action pursuant to 42 U.S.C. § 1983 back in April 2021. Plaintiff claims that Defendant Michael Lowe ("Lowe") retaliated against him when he searched Plaintiff during a med-line shakedown and wrote Plaintiff an allegedly false ticket for having two yellow pills and some powder. Plaintiff alleges that the retaliation was due to prior written complaints Plaintiff made against Defendant Lowe. Plaintiff also alleges that Defendants Samantha Rodriguez ("Rodriguez") and Warden John Varga ("Varga") failed to intervene in the alleged retaliation. Defendants have moved for summary judgment. Plaintiff responded to Defendants' motion for summary judgment, and Defendants have replied. For the reasons discussed below, the Court grants, in part, and denies,

---

[1] Plaintiff initially filed this lawsuit *pro se* and the Court recruited him counsel. (*See* Dkt. 69.) Later, Plaintiff filed a motion to proceed *pro se*, which the Court granted on March 6, 2023. (Dkt. 100.) Since that time, Plaintiff has litigated this case on a *pro se* basis. The operative complaint in this case is Plaintiff's third amended complaint (Dkt. 77), which was submitted by Plaintiff's counsel in November 2022.

in part, Defendants' motion for summary judgment.

## I.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court.  Rule 56.1 requires the party moving for summary judgment to provide a statement of material facts and a supporting memorandum of law. LR 56.1(a)(1), (2) (N.D. Ill.) (amd. Feb. 18, 2021). The statement of material facts "must consist of concise numbered paragraphs[,]" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(1),(2).   When addressing facts in its memorandum of law, the moving party "must cite directly to specific paragraphs in the LR 56.1 statements or responses." LR 56.1(g).

The party opposing summary judgment must submit a supporting memorandum of law and a response to the moving party's statement of facts. LR 56.1(b)(1), (2). A fact may be admitted, disputed, or admitted in part and disputed in part. LR 56.1(e)(2). To dispute an asserted fact, the opposing party "must cite specific evidentiary material that controverts the fact" and explain "how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate[.]" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3).

Here, Defendants filed a Rule 56.1 statement of material facts with their motion for summary judgment. (Dkt. 206.) Consistent with the Local Rules, Defendants also provided Plaintiff with a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment.  (Dkt. 207.)

Plaintiff is a frequent litigator and knows of Local Rule 56.1's requirements. Indeed, despite being a frequent litigator, the Court nevertheless explained the summary judgment process—including Local Rule 56.1—to Plaintiff. (Dkt. 200.)

For his part, Plaintiff submitted a response to Defendants' statement of facts. (Dkt. 218.) The document does not meaningfully correspond to Defendants' facts, does not clearly indicate whether Plaintiff admits or disputes Defendants' facts, and also attempts to assert additional facts.[2] Separately, Plaintiff submitted a memorandum of law opposing summary judgment. (Dkt. 219.)

Even generously construed, Plaintiff's response cannot be deemed an appropriate response to Defendants' statement of material facts.

Although courts construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules."). Local Rule 56.1 "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995); *see also Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

---

[2] Plaintiff has taken Defendants' factual statements out of order, seemingly grouping together those facts that he purports to admit and those that he purports to dispute. (*See* Dkt. 218 at pgs. 1-8.) Despite his apparent grouping technique, his responses do not clearly indicate whether he admits or disputes each of Defendants' factual statements. (*See id.*) Further, the facts that Plaintiff has "grouped together" at pages 4-8 and identified as "disputed" suffer from various problems and do not comply with the Local Rules.

Because Plaintiff did not properly respond to Defendants' LR 56.1 statement of facts, the Court accepts Defendants' "uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Similarly, the Court considers Plaintiff's "additional facts" (which he has inserted in his response at pgs. 8-11) only to the extent they are supported by the record or where Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); *see also* Fed. R. Evid. 602.

With these guidelines in mind, the Court turns to the facts of this case, stating those facts as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

## II. Facts

Plaintiff is in custody with the Illinois Department of Corrections ("IDOC") incarcerated at the Dixon Correctional Center ("Dixon"). (Dkt. 206, Defendants' Statement of Facts at ¶ 1.) Defendant, Michael Lowe, was employed by IDOC as a Correctional Officer at Dixon on December 6, 2019. (*Id.* at ¶ 2.) Defendant, Samantha Rodriguez, was employed by IDOC as a Correctional Officer at Dixon on December 6, 2019. (*Id.* at ¶ 3.) Defendant, John Varga, was Warden of Dixon on December 6, 2019. (*Id.* at ¶ 4.)

On December 6, 2019, Plaintiff went to the healthcare unit to take his prescription medication. (Dkt. 206 at ¶ 6; *see also* Dkt. 205-1 at 18:10-16.) At that time, Plaintiff was taking Gabapentin in the form of two small yellow pills and Wellbutrin. (Dkt. 206 at ¶ 6.) Plaintiff testified that he started taking Wellbutrin in 2018. (*Id.*) On October 22, 2019, Dixon policy required Wellbutrin be crushed. (*Id.* at ¶ 7.) Plaintiff testified that these medications are not "keep-on-person medications" and "[y]ou're not supposed to have unauthorized medication on you[.]"

(*Id.* at ¶ 8.)

When Plaintiff returned from the healthcare unit, Lowe announced that he was going to conduct a shakedown of the med-line entering the building. (*Id.* at ¶ 9.) When asked during his deposition why he decided to shakedown the line, Lowe testified that "honestly, that's something I did a lot. I shook down lines as they came in and out" and "[t]hat's how you keep an institution safe, yourself and others safe." (*Id.* at ¶ 10; *see also* Dkt. 205-2 at 17:6-9, 16-17.) When asked whether any Dixon inmates tried to bring their medication out of the med building without taking them, Lowe testified that "[i]nmates have been caught with their meds outside of health care." (Dkt. 206 at ¶ 11; *see also* Dkt. 205-2 at 18:13-15, 18-19.)

When he conducted the December 6, 2019, shakedown, Lowe "informed them I was going to shake down the line, and so . . . I just started . . . [to] pat them down, check their pockets and everything, make sure they have nothing on them." (Dkt. 206 at ¶ 11.) Lowe testified that inmates are subject to be searched at any time in the facility, and that it is more common for inmates to be searched when they are coming back from the med-line. (Dkt. 205-2 at 32:1-7.) According to Lowe, these searches occurred because "when they're out of the building, a lot of times, they trade meds or try to bring other items back with them that they're not supposed to have." (Dkt. 206 at ¶ 11.)

Plaintiff testified that at the time of the shakedown, there was "like anywhere from nine to eleven guys there. I was like maybe the seventh or eighth guy in the building." (Dkt. 205-1 at 24:8-10.) Plaintiff testified that when Lowe was going to search him, he "grabbed the front of my jacket – well, first he was searching me. I had my hands on the wall and then it seems like he was doing a little bit extra so I opened up my jacket, and I held the right side of my jacket, and I put my hands in my pocket and started taking everything out of my pocket, and I was asking him why

is he giving me a hard time." (*Id.* at 27:1-8.) Plaintiff testified that "with other people, [Lowe] did a simple pat down and with me he was doing more than just a simple pat down. He was going down my back. He was going down the side of my jacket like a zigzag motion." (*Id.* at 27:11-18.)

Lowe testified that he saw Plaintiff grab an item out of his pocket and drop it to the floor, which had some powder and some pills in it. (Dkt. 206 at ¶ 13.) Plaintiff testified that "as I was pulling stuff out of my pocket [*sic*] and that was making [Lowe] mad because I'm taking everything out before he can go through my pockets. And then Ms. Rodriguez tapped on the window and she pointed to some pills on the floor." (*Id.* at ¶ 14.) Rodriguez was in "the bubble" behind glass. (*Id.*)

Rodriguez testified that she observed Plaintiff with his hands in his pockets when Lowe was trying to search him. (*Id.* at ¶ 15.) She also testified that she observed Plaintiff drop the pills and powder on the ground. (*Id.*) She testified that she informed Lowe by knocking on the glass and pointing to where the pills were on the ground. (*Id.*)

Plaintiff testified that there was "one pill by the guy's foot next to me" and "there was one like behind me, in the middle of the foyer." (*Id.* at ¶ 17.) Plaintiff testified that the pills were "both yellow." (*Id.*) He testified that he does not know whether there was powder on the floor because it was winter and it was hard to tell. (*Id.*) When asked if the search was against rules, Plaintiff responded: "I don't think it's against the rules. I don't know, but I just knew [Lowe] was searching. He was doing a little bit extra on me, and I was wondering why is he still harassing me I hadn't seen him in awhile. I just didn't get it." (Dkt. 205-1 at 27:23-24; 28:1-3.)

Plaintiff received a disciplinary ticket for offense 203 Drugs & Drug Paraphernalia and 215 Disobeying a Direct Order Essential to Safety and Security and a shakedown slip. (*Id.* at ¶

19.)  The search slip from December 6, 2019, identifies Plaintiff as the "violator" and the items found as two "yellow pills stamped D03."  (Dkt. 205-6.)  Plaintiff grieved the disciplinary ticket and the grievance was denied.  (Dkt. 205-9.)

Plaintiff testified that before the December 6, 2019, shakedown, he had made written complaints against Lowe.[3]  (Dkt. 205-1 at 38:1-24;  39:1-3.)  Plaintiff testified that he did not use

---

[3]  The Court observes that it is not entirely clear from Plaintiff's testimony the exact interactions that Plaintiff had with Lowe that led to written complaints.  At his deposition, when asked what Lowe was retaliating against him for, Plaintiff testified as follows:

> Well, when I was working in the building 28, I used to be a porter and there was a guy from the mental health part, and they put him in building 28, and he kept looking at the female bubble officer, and he asked me to make this guy stop staring at the lady in the bubble.

> I go to the guy, I said, look, man stop looking at her so that we can go to gym.  So the guy said, I can't help myself.  She's beautiful.  I can't help myself.  I tell Lowe, hey, man, I tried.  I can't make him stop.  So he said, okay, you fuckers ain't going to gym now, so he cancelled our gym.

> So I wrote him up to Major Cameron, and she moved him and other escort officer to another location and if I'm not mistaken, she gave them some days off.

> So after that he start harassing me because I made that complaint against him.  So when he started harassing me, when I seen him chewing tobacco, I would write the Major's office, and I would say, he's chewing tobacco.  They're not supposed to have tobacco on state property.

> So then after that, he just had been harassing me and been harassing me and harassing me.  Every time he see me, he want to shake me down, you know, just because I complained about him and the things that he was doing, he's been having it out for me.

(Dkt. 205-1 at pg. 37:12-24;  38:1-16.)

> Plaintiff also testified to the following interaction with Lowe:

> We had another interaction when we were leaving the gym.  They were intentionally – him and his partner, it's below zero outside, they would walk us real slow as prisoners we're not properly dressed for the weather, not for extreme cold weather, and they would walk real slow, you know, and stopping the line and stuff like that so the guys would get upset and would yell at him, and he would walk even slower.  And every time I wrote him up, I put my name on there so he know it's me so he didn't like me because of my complaints.

(*Id.* at pgs. 39:18-24;  40:1-4.)

When asked if he could recall other instances where he submitted a complaint against Lowe besides the two mentioned above, Plaintiff stated, "[h]im chewing tobacco."  (*Id.* at pg. 43:2.)  Plaintiff testified that "[a]ll of this was around the same time, around that 2017, 2018.  I wrote him up a couple times for chewing tobacco[.]"  (*Id.* at pg. 43:4-6.)

IDOC forms for these "complaints." (Dkt. 206 at ¶ 22.) He does not recall how many he wrote. (*Id.*) Plaintiff testified that he would send the letters to the Major and Warden's office by mail but never received any receipt confirmation or response. (*Id.*) Plaintiff never heard from internal affairs regarding his "complaints" against Lowe. (*Id.*) When asked if he recalled "the last instance or encounter [he] had to face with Lowe and file a complaint was in 2017 or '18[,]" Plaintiff answered "yes." (Dkt. 205-1 at 43:15-18.)

Rodriguez testified that she was not aware of Plaintiff's complaints against Lowe. (Dkt. 206 at ¶ 23.) Plaintiff testified that he did not have any issues with Rodriguez before December 6, 2019. (*Id.* at ¶ 24.) Lowe testified he does not recall Plaintiff and he was not aware of any grievance, conversations, or complaints related to Plaintiff. (*Id.* at ¶ 25.)

The disciplinary ticket that was issued to Plaintiff states as follows: "I c/o Lowe was shaking down HU 36 med-line as they came back into HU 37 and felt an item inside the jacket of I/m Wagner, Terry #R07282 when I went to see what was in his coat I/m Wagner pulled away and was refusing to allow me to see what he had. After several direct orders to put his hands on the wall and let me see what he had I/m Wagner dropped a pill cup with 2 yellow pills that say DO3 on them and some unidentifiable powder onto the floor that was white in color and was not able to be recovered." (*Id.* at ¶ 26.)

Plaintiff attended the Adjustment Committee hearing for the ticket, was found guilty, and was sentenced to 3 months C grade, 1 month segregation, and 6 months contact visits restriction. (*Id.* at ¶ 27.)

Plaintiff testified he sent Varga letters complaining about the Adjustment Committee finding, although he never received a response. (Dkt. 205-1 at 67:5-19.) Plaintiff testified he does not know if Varga ever received any of his letters complaining about Lowe. (*Id.* at 68:4-6.)

Plaintiff testified he did not have any issues with Varga before December 6, 2019, and Varga was not present when the pills were found. (*Id.* at 68:7-12.) Varga testified he was not aware of any letters or complaints sent by Plaintiff. (Dkt. 205-4 at 23:24; 24:1-3.)

Varga also testified that when reviewing and signing off on an Adjustment Committee report, he is not reviewing to determine whether the Adjustment Committee's decision of guilty or not guilty is substantiated. (Dkt. 205-4 at 32:12-15.) Varga is not part of the Adjustment Committee hearing. (*Id.*) Varga is just reviewing the Adjustment Committee report to ensure the discipline fits within the offense that is prescribed by the IDOC directive. (*Id.* at 32:16-20.)

## III.    Summary Judgment Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

## IV. Discussion

### A. Plaintiff's First Amendment Retaliation Claim against Defendant Lowe

At the summary judgment stage of a retaliation action, a plaintiff must present evidence permitting a reasonable jury to conclude that: (1) he engaged in activity protected under the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) his First Amendment activity was at least a motivating factor in Defendants' decisions. *See Perez v. Fenoglio,* 792 F.3d 768, 783 (7th Cir. 2015) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

Once the plaintiff makes a *prima facie* showing by establishing these three elements, the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *Mays v. Springborn,* 719 F.3d 631, 634 (7th Cir. 2013); *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011).

If the defendants provide legitimate and non-retaliatory reasons for their actions, then the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus. *See, e.g., Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012); *Zellner v. Herrick,* 639 F.3d 371, 379 (7th Cir. 2011). "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner*, 639 F.3d at 379.

At the outset, the Court observes that Defendants' argument as to this claim is muddled. It is clear that they admit that filing grievances is protected activity. But Defendants have not

10

specifically addressed each of the elements of a *prima facie* retaliation case (as they pertain to this case), nor have they meaningfully engaged with the burden-shifting nature of a retaliation claim. (*See* Dkt. 205 at pgs. 4-8.)

Nonetheless, the record could support a jury finding that Plaintiff engaged in protected activity under the First Amendment with his complaint-writing against Lowe. *See Turner v. Safley,* 482 U.S. 78, 89–90 (1987) (inmates retain a First Amendment right to complain about prison staff, whether orally or in writing, but only in ways consistent with their status as prisoners).

The record also could support a jury finding Plaintiff suffered a deprivation (a shakedown that led to disciplinary action) that would likely deter future First Amendment activity. *See e.g., Cullum v. Godinez*, 2016 WL 304865, at *1 (S.D. Ill. Jan. 25, 2016) (jury could find plaintiff suffered deprivation likely to deter future protected activity where evidence showed plaintiff spent 30 days in a segregation unit, lost gym and yard privileges for 30 days, lost access to commissary privileges for 30 days, had his security level demoted, and lost some personal items); *see also Martin v. Nicholson*, 2019 WL 6338062 at * 2 (S.D. Ind. 2019) (shakedowns may occur regularly, but it seems safe to assume they are not welcome by inmates, and thus a reasonable jury could assume a retaliatory shakedown would dissuade an inmate of ordinary firmness from engaging in protected activity).

With respect to the causation element, Plaintiff testified to having what he describes as a history of minor conflicts with Lowe (which resulted in his complaint-writing in 2017/2018), and he has introduced the Declarations of two inmates attesting to Plaintiff's prior interactions with Lowe (*see* Dkt. 218 at pgs. 79-80, Declarations of Ronald Reno and James Wheeler). Plaintiff also testified that he *told* Lowe, on more than one occasion, that he had "written him up" (*see* Dkt. 205-1 at 55:2-24; 56:1-13). This is at least some evidence that Lowe knew about Plaintiff's

11

complaint-writing against him.[4]

Additionally, there is some question as to why the initial December 6, 2019, shakedown was conducted; Lowe testified that "honestly, that's something I do a lot" and "[t]hat's how you keep an institution safe, yourself and others safe[,]" but his testimony does not meaningfully address the regularity or frequency of med-line shakedowns (or any particular circumstances that may have been present on December 6, 2019, that may have precipitated a shakedown). Also, Plaintiff testified that during the search, he was handled by Lowe in a way that was different than how Lowe handled other inmates.

Plaintiff also has introduced the Declarations of three inmates who seem to have been present at the December 6, 2019, shakedown, witnessed Plaintiff being searched, and heard Lowe make certain statements to other officers suggesting that the search of Plaintiff was not conducted for legitimate purposes. (*See* Dkt. 218 at pgs. 38-40, Declarations of Anthony Muniz, Davonta Williams, and Kody Terrill.) Plaintiff also maintains that the disciplinary ticket was unwarranted, insofar as he says he did not pull away from Lowe during the search and because the pills on the floor did not belong to him.[5]

---

[4] As discussed above, Lowe testified that he did not recall Plaintiff and he was not aware of any grievance, conversations, or complaints related to Plaintiff.

[5] The Court observes that while it is not entirely clear from the record (or Plaintiff's response for that matter), it appears that his version of events is that he did not drop any pills on the floor and the pills that were found did not belong to him. He seems to take the position that other inmates were dropping pills on the floor on the day of the shakedown and the pills belonged to those inmates. The Declaration of inmate Muniz states that: "I witnessed guys walking into the building and while Lowe was not lo[o]king they were throwing pills down to the floor. There were all different type of medication." (Dkt. 218 at pg. 38.) Similarly, the Declaration of inmate Williams states that: "As I was walking into the building I started throwing medication on the floor because I didn't want to go to seg. A lot of other people was throwing their medication as well." (*Id.* at pg. 219.) And, the Declaration of inmate Terrill states that: "inmates as they were coming into the building they were throwing their medications onto the floor." (*Id.* at pg. 40.) It is axiomatic that district courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, "both of which are the province of the jury[,]" *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011), but, if this is true (that inmates were throwing medication on the floor as they came into the building on the day of the shakedown), it cuts both ways. On the one hand, in support of Plaintiff, this evidence indicates that the drugs were not his. But, on the other hand, this evidence tends to undermine Plaintiff's contention that the complained-of shakedown was unwarranted and retaliatory in nature.

This is sufficient to make a *prima facie* showing that Plaintiff's 2017/2018 complaint-writing motivated the December 2019 shakedown, which ultimately led to the issuance of a disciplinary ticket.

Defendants argue that they have proffered a legitimate, non-retaliatory reason for the December 6, 2019, shakedown: "safety and security." (Dkt. 205 at pg. 5.) They point out that the search was not against prison rules, that other inmates also were subjected to the complained-of shakedown, and that Plaintiff admits to putting his hands in his pocket and throwing items on the floor. (*See id.*) But Defendants do little to flesh-out these particular points, and, as discussed above, there is evidence in the record that calls into question whether the adverse action taken against Plaintiff by Lowe (a shakedown which led to disciplinary action) was justified under the circumstances.

On this record, the Court finds that there is sufficient evidence upon which a reasonable jury could find that the "safety and security" reason cited by Defendants was not the real reason for the December 2019 shakedown (which led to a disciplinary ticket).

Accordingly, Defendant Lowe is not entitled to summary judgment on Plaintiff's retaliation claim, and the motion for summary judgment is denied as to this issue.

### B. Plaintiff's Failure to Intervene Claim against Defendants Rodriguez and Varga

The Seventh Circuit has held that, "under certain circumstances, a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted). To succeed on a failure to intervene claim, Plaintiff must demonstrate that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Additionally, "[i]ndividual liability under § 1983 . . . requires personal involvement in the

alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).

With respect to Defendant Rodriguez, the evidence before this Court shows that she did not perform the complained-of shakedown; rather, she observed the shakedown from behind glass. Additionally, she specifically testified that she was not aware of Plaintiff's complaints related to Lowe.

With respect to Defendant Varga, the evidence shows that Varga was not present during the shakedown, was not aware of any letters or complaints sent by Plaintiff and when reviewing and signing off on an Adjustment Committee report, he was not reviewing to determine whether the Adjustment Committee's decision of guilty or not guilty was substantiated. What's more, he was not part of the Adjustment Committee hearing and he was just reviewing the Adjustment Committee report to ensure the discipline fits within the offense that is prescribed by the IDOC directive.

Plaintiff's speculation about what Rodriguez and Varga allegedly knew (about his history or prior interaction with Lowe) and his personal belief that that these Defendants should have taken steps to intervene in the complained-of retaliation are not enough to defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat a summary judgment motion."); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (summary judgment is the "put up or shut up moment in a lawsuit").

Accordingly, Defendants Rodriguez and Varga are entitled to summary judgment on Plaintiff's failure to intervene claim, and the motion for summary judgment is granted as to this issue.

**V.       Conclusion**

Defendants' motion for summary judgment (Dkt. 204) is granted in part and denied in part. Plaintiff shall proceed upon his First Amendment retaliation claim against Defendant Lowe.  All other claims and Defendants are dismissed with prejudice.


Date:  February 9, 2026          By:   _____
                                       Iain D. Johnston
                                       United States District Judge